Good morning. Good morning. May it please the Court, my name is Richard Keys. I represent Julian Pollok in his capacities as administrator of the estate of Dr. Salkin, and in his capacity as the sole heir of Dr. Salkin, and in his individual capacity, and I mention that because it will be important, I believe. Now, this appeal is de novo, and the question before the Court is not so much whether the district court erred, but whether or not the Vanguard Group and Vanguard Marketing Corporation are entitled to summary judgment. So I'm not going to focus on the district court erred. I'm going to focus on why Vanguard is not entitled to summary judgment. You say this is de novo because it's entirely legal in its ramifications, is that correct? We're not looking at facts? You don't care about any facts? Oh, no, absolutely. The facts matter. But this Court sits in the first instance to decide whether or not summary judgment is appropriate. Oh, of course, yeah. Because it's a de novo review. Okay. And I will remind the panel and counsel that the standard is giving Mr. Pollok every benefit of the doubt. If there is a question of fact, if a reasonable trier of fact could differ, summary judgment must be denied. Even if the facts are not in dispute, if a reasonable trier of fact, judge or jury, could draw conflicting inferences from the undisputed facts, summary judgment must be denied. Now, Mr. Pollok's claims are for negligence and conversion under California law, and they are well-based in California law. Edwards v. Jenkins, the California Supreme Court, held that a stockbroker's failure to deliver stock when requested by the client is a tort. It's also a breach of contract, but it's a tort. It's conversion. Well, how do you deal with the issue of the contracts here that are, the court below found that there was no disputed issue of fact about the fact that these contracts existed, the prospectuses, the brokerage agreements, which permitted Vanguard in this case, if there was a reasonable dispute, not to turn over the funds in the case. Is it your position that there is some factual issue as to whether these contracts govern the case? Is that your position? To begin with, yes, there is, Your Honor. Counsel, hold on one second. We've got some people in the back. Come and sit here in the front if you'd like. Just come around here through the side and come sit here in the front so you can participate. These are students and folks who want to hear your argument, counsel. They came today. Do you want them to go to the bench? There's a bench here in the front. There's a bench up here in the front. It's a lot of pressure, you know. I know. You can handle it. Welcome to you all. Very well, counsel, please proceed. To address the first issue, yes, there is a question of fact as to what the operative, quote-unquote, contract documents are. What do you say they are? We say the only thing they could be is the two documents that were signed in 1997. Those are the only documents that are even close to authenticating. But if he received the later prospectuses, then it's a legal question, not a factual question, whether they amended the contract, right? Well, yes, but then it becomes a question of what the reasonable expectations of Dr. Salkin were. But before we even get there, the evidence presented by Vanguard as to the delivery of the, quote-unquote, some 17 years after the original contract was signed, they failed in their presentation of evidence. How? It seems like, as I understand it, they said, we always send these amended notices. They go to everyone with these accounts. In the normal course, they would have been delivered to him. We had his address correct. I mean, why isn't that enough to show that they sent the contract? Because that's not what Mr. Kuykendall's declaration says. So what is the difference from what I said? If you look at Mr. Kuykendall's declaration, all it says is these are documents. We mail them out. We don't tell you when we mailed them out. We don't tell you who we mailed them to. We don't, he does not say, which is surprising, he does not say in the normal course of our business, these documents would have been mailed to Dr. Salkin. So you say we don't, it doesn't say who we sent them to. But as I can read Paragraph 6, it says, it's the standard practice to deliver copies of Vanguard's brokerage account agreement to each investor with such an account. Isn't that telling us who they send them to? No, because if you look at his actual words, it doesn't refer to the specific documents he's talking about. It doesn't say when they were sent. And we also have the contradictory fact. Remember that these documents, we don't know when they were sent. They didn't tell us when they were sent. They didn't tell us if they were sent before or after Dr. Salkin died. Well, counsel, with respect and following up on my colleague's point, if I understand correctly, it was clear that Dr. Salkin did sign a couple of original documents. After that, it was all sent in the mail. Maybe. Maybe. You say maybe. But the reality is under California Evidence Code 641, which I think is what the district court was looking at, in a unilateral contract like this, there is, in effect, a presumption that he got them, unless he can prove otherwise or you can prove otherwise. If there's evidence that was mailed, don't say that. But isn't that what 641 is designed to cover? No, 641 says there's a presumption that if it's put in the mail, it's been delivered. How is it not enough to say that it's the standard practice to deliver copies to each investor with such an account? When did they do it? Why does it matter? As long as they did it when they had some time in the month or so with the new prospectus, why does it matter? Because they didn't tell us when they did it. And if they did it after Salkin died, it doesn't matter. Now, remember, I'll point it out in the briefing. Is that even true? If you have an account with a brokerage firm and they continue to send out what they would in the normal course of business, not knowing whether Dr. Salkin is dead, why would that be any different? You're dealing with a representative, of course, but isn't it the same kind of deal? Got a unilateral contract? Well, no, because the premise is when you send something, the recipient, Dr. Salkin, would have the opportunity to say, no, I disagree with this. So you're saying that the moment Dr. Salkin died, all bets were off, any contractual obligations were over? Is that what you're saying? They couldn't change the contract at that point. And what do you rely upon for that point? With a unilateral contract and a pattern and practice that shows that that's what they did on a continual basis when he was alive. What I rely on is common sense and the principle that the whole idea that Vanguard, a mammoth corporation, can impose on a consumer new terms that consumers such as Dr. Salkin has to have the opportunity to object. Is that what happens, for example, with credit cards? Everybody gets them all the time and says if you don't object or you use them after this point, you're deemed to have accepted them, a unilateral contract. In this case, the money was still there. They were handling the money. Nobody objected. Now he was dead, but he had a representative. Does that change anything? They didn't send it to Mr. Pollack as a representative. Did they know he was the representative? Yes, they did. Okay. Because he thought and told them that. I thought he was involved right from the get-go. Pretty much. And claimed to be the representative. Well, he didn't claim to be the representative. He was appointed by the court as the personal representative for the estate. He's the name beneficiary of the IRA. I understand. And did he immediately say, I don't want any changes? He did not. But he also did not receive the documents. I understand that. Because there was a dispute with somebody else about who was the appropriate representative, right? Yes. Well, that kind of leads to the next question. So let's assume that those contract documents apply. Now we're really getting into questions of fact. Because Vanguard relies on a provision that says, if Vanguard receives reasonable notice of a dispute, it can freeze the account. Moving aside for a second what freeze means. The first issue that the court has to address is, did Vanguard receive reasonable notice? Focusing on the IRA, clearly not. Because, first of all, Alduenda never asserted a claim to the IRA. The issue, counsel, is reasonable notice. It's not whether the dispute is reasonable. Correct? It's reasonable notice. They certainly were notified that there was a dispute between Pollack and Alduenda. They were clearly on they received a copy of a TRO, whether it was in effect or not. There were repeated calls by each side saying, it's my money, no, it's my money. So why isn't that reasonable notice of a dispute? It's not whether the dispute is reasonable. Because, first of all, with respect to the IRA, Alduenda never said, I'm entitled to the IRA. Well, it was in the TRO. Under any circumstances, Vanguard could not have received reasonable notice. Reasonable is always a question. Well, reasonable applies to notice, not to the nature of the dispute. Well, it doesn't say actual notice. It doesn't say implied notice. It says reasonable notice. Reasonable notice is you call up and you say, it's my money. Well, that's a good question. What does reasonable mean? Well, I have an interpretation. You don't understand what freeze means either, correct? I certainly don't, and it certainly was not something that was explained to Edward Sulkin. I mean, again, these are terms being imposed on a consumer by a giant corporation. Counselor, you keep saying that. I understand it's very popular in a progressive state to say that, but this is a court. So let's just deal with this as plaintiffs and defendants and let it go at that, okay? Okay. But nevertheless, it's drafted by Vanguard. They have to make sure. The question is, what was Ed Sulkin's reasonable expectation assuming he got those documents? What was his expectation as to what reasonable notice meant? It seems like receiving a TRO that listed the IRA would be reasonable notice. Well, I can understand that, except let's look at what the trial court in that case said and the probate court said. It issued a TRO that was to be effective upon posting of a bond of a million dollars for a 15-day stay, and the bond was never posted. So, no, they never got an order. But they can tell that litigation is going on about who has a claim to this estate because a TRO copy came to them. Now, maybe it wasn't fully effectuated, but there's no way for Vanguard to be the court and know that for sure. Vanguard finds out there's a dispute here that's in court about whose money this is. Why isn't that reasonable notice of a dispute? Let me also say, under California law, particularly the Messerall case, Vanguard has a duty to investigate. They have a duty to inquire. So in the Messerall case, the boat was there, but there was no other litigation going on. And the court says, why didn't you at least ask the owner of the boat who the boat should have gone to? But here, there was litigation going on, and they got notice of a TRO. So it seems really different. And then they were told that the TRO was never effective, and they were told what? But they were told that by one side, and the other side is calling and saying, we're going to sue you if you listen. The other side made no contact at all. But at that point, though, your client went into court seeking an order demanding that Vanguard immediately release the money. And what happened? The court said, no, we're not going to do it. Right? Is that notice? The court said there is no showing of urgency. No, I get that. But the reality is, your client went to court to say, this other party has no right to this. Give it to us. Tell Vanguard to do that. And the court said, no. What was Vanguard supposed to do at that point? Say, oh, well, we're really sorry. Here, take the money. Is that what they're supposed to do? Is that common sense? No. What they should have done is they should have interplayed the funds. Well, that's one way to handle it, perhaps. But the contract documents provided that they could, in quotes, freeze them. Did they not? What does freeze mean? Well, they understood it to mean that they don't do anything with them. Does it mean we can ignore our common law duties? We Vanguard have decided for our own self-interest, because we don't want to get sued, we are going to exercise dominion and control over your property. It's up to you. You've got one minute and 21 seconds left in this one. Now we've got another case. Do you want to continue here? Do you want to do a rebuttal? Do you want to wait the next case and finish this? What's your pleasure? Let me finish this thought. Okay, go ahead. I appreciate that. It seems like where you're going with this is that Vanguard should have known that these funds were going to decline in value. But I don't understand how that's true. Couldn't they just as easily have gone up in value? At the beginning, sure. But the fact of the matter is both the brokerage account and the IRO account were heavily invested in the Vanguard Energy Fund, which was heavily invested in oil company stocks. And the oil prices at that time were declining. But prices decline, and then they start going up. So at any given day, how do you know whether the next day it's going to go up or down? That's what Vanguard does. They analyze the market. They are experts at that. I think it's going to be really hard for you to prove that Vanguard can tell the future. I mean, they may be a really good investment company, but I don't understand how anyone knows on the next day whether it's going to go up or down. And if it's going to go up, then you're going to hurt your client by selling. So I just don't understand how you can have this argument. Because what they should have done and what the California law says they had to do was interplead the funds, not sit here and say, I'm not doing anything. I don't care what you tell me. Give me a court order. But that's not true if the contracts govern, correct? Because under the brokerage agreement, they specifically say that they are not to be hold liable for any trading losses. So that might be true if there weren't agreements here under common law duties, but these agreements supersede the common law duties, do they not, if the agreements are in effect? Again, it's a question of fact. What was the reasonable understanding of Ed Salkin? What would a person in Ed Salkin's position have understood? I'll tell you what. Why don't you hold your dual tones for the next case, and we will now hear from Vanguard, and then we will wait with anticipation for the discussion of the splitting. Good morning. May it please the Court. Michael Bachman, Pepper Hamilton for the Vanguard entities. The district court was right to grant summary judgment for at least two fundamental reasons. First, there were contracts governing account agreements which specifically gave Vanguard the right to do what it did here. Where were the contracts? You haven't produced the contracts that existed in 1997 when he opened the account, though, correct? They are not part of the record, Your Honor, no, because those weren't in effect at the time. What we did provide and produce is the documents that governed at the time that Mr. Salkin died and at the time that the freeze was put in place. So you say even if you had those, they would not govern, so it's immaterial that those documents are not in the record? Correct. But what's important is in 1997, Mr. Salkin signed a document in which he agreed to be bound by the terms of the prospectuses. To answer my colleague's question, you're saying that he signed the documents, but they were superseded by the unilateral nature of these contracts that went over time, is that correct? Which is perfectly permissible in California law. I'm not arguing that. Yes, Your Honor. I just said that's what happened, right? Absolutely, absolutely. And the evidence is crystal clear that we provided the account agreements. And Judge Amon, he didn't have a very good answer to your question, okay, then what contracts govern? Let's remember we're about to hear that he also filed a breach of contract case. So where are the contracts? I mean, I think what we have here is a little bit of a shell game going on as to, you know, where's the contract? We provided the contracts that govern here, and there's no reasonable dispute about that. The declaration that describes how these contracts are sent is actually fairly vague. So is there a reason why there aren't really good records about when someone was mailed a contract that governs their account? I'm surprised that Vanguard couldn't have given a better declaration. Perhaps they could have put more detail in the declaration, but it wasn't reasonably in dispute that these were the account agreements that govern. So, I mean, in the beginning of the case, when a motion to dismiss was filed, we submitted an affidavit saying these are the governing account agreements. They conducted no discovery at all to undermine that point. So, I mean, from my perspective, from the beginning of the case, this wasn't really an issue that there was a genuine dispute about. So here he's arguing these aren't the contracts, we never got them. Was that not argued in the district court? It wasn't argued until their response to summary judgment, Your Honor. And all they did, remember, they didn't provide any evidence. They just provided a bunch of boilerplate objections, which is reviewed by this court under abuse of discretion standard. And clearly the district court did not abuse its discretion in finding that these were the authentic contract documents that govern. And today they still can't tell you, okay, well, then what is the contract that governs? It's these documents. And these documents gave Vanguard the right to freeze an account if there was reasonable notice of a dispute. Putting to the side for a moment what Judge Friedland talked about in terms of the market going up and down, the term freeze in this context is not exactly clear, is it? I think it's clear, Your Honor. What does it mean? It means to deny, not let people access the account so that they can make distributions. That's what it means? It doesn't have anything to do with cryogenics or anything like that? It does not mean cryogenics. And let's remember, he used the term freeze, that Mr. Pollack used the term freeze, in a state court action to describe exactly what he did. I mean, there is no jury question as to what freeze means here, Your Honor. Okay. But bottom line is you're saying if there was any question, it would be up to the jury to determine what the contract meant? Is that what you're saying? No. I'm saying it's a matter for the court to decide in the first instance if the contract is ambiguous. It is not ambiguous what freeze means. Freeze means that we are not going to let access to the account when there's a dispute, which is exactly what happened here, Your Honor. Do you have any case or cases that you can refer us to that defines freeze in the way you just have? The blocker case that we cite from Oregon, the Burchillo case that we cite. The state court issue from Oregon. Do you have anything from California? There is an unpublished California case that came out very recently. We didn't cite it in the briefs because it was unpublished, but there is a California case involving a bank that interprets it that way as well. And how does that case define freeze? Not allowing access to the account when there was an issue that meant that the account should not allow dispersion. Basically, you could do whatever you wanted with the account. You just couldn't allow them to have access to it. Is that correct? We wouldn't allow distributions from the account to either party until the dispute was resolved. Have you all been allowed to do naked shorts? No. In fact, the contracts say we can't make trades in the account. That part's clear, right? Yes, Your Honor. So anything that the contract did allow you to do during the freeze, other than give them access to it, you could do that. Is that right? I'm not sure I understand the question, Your Honor. You had a panoply of things that you could do in terms of investing these monies, right? No.  We don't have any discretion at all as to what the accounts can invest in. So from your perspective, since there was no direction, you just had to let them stay? We had to, yes. And that's the reason why freeze is meaningful in this case, because you couldn't do anything with them. We couldn't do anything with them. And the sort of but-for world that they postulate here, that we should have liquidated all of the assets and then interpled them, makes absolutely no sense. And that might have actually given rise to a breach of contract claim. And it's interesting that in their own brief on page 64, when they're talking about unconscionability, they say that liquidating accounts would have horrendous tax consequences. So if we had liquidated the accounts, I imagine we would be here on a different claim. And, you know, on the interpleader point, we didn't have a duty to interplead because the contracts don't require us to interplead. That's why we have them. Are these, in your view, unilateral contracts? They are unilateral contracts in the sense that they are not negotiated with the customers of Vanguard, which, again, we cite a number of California cases in our brief. Those are perfectly enforceable. And even if it's technically an adhesion contract, it's not unconscionable if the terms aren't unreasonable. This isn't unreasonable. It protects the assets so that they will go to who Dr. Salkin intended them to go to. And there was no issue about unconscionability raised below, correct? Well, it was waived. They didn't raise it until I think their first or second motion for reconsideration below. So because the contracts gave us the right to do what we did, that's the end of the case. A contractual justification. Now, the district court relied on the economic loss doctrine. I will confess the sort of outer boundaries of the economic loss doctrine are a little bit in flux. But if it means anything, it means that a duty in tort cannot supersede a contractual right. So that's the end of the case as far as Vanguard is concerned. To the IRA account, because if what they were notified of is a dispute about the will or whether there was a trust, and the IRA account couldn't really be affected by that anyway, then how was the IRA account really in dispute? We had a TRO telling us not to release the IRA account. And the statements that the IRA account wasn't in dispute are just not correct. There's an affidavit in the record that we cite in our brief from counsel for Aldewenda that says the trust petition is seeking the IRA. It was in the original TRO. The second order where they went in seeking authority from the court to authorize us to release the accounts, which was denied, it was in there. It was in December it was being discussed. All along, it was in the IRA. There was a claim to the IRA. And it's not up to Vanguard, I think, as Your Honor pointed out, to be the judge. It was in dispute. And there was a TRO forbidding us to release it. And then the California court did not authorize us to release it. When they went to the superior court seeking a TRO, did they ask that an interpleader be required? They never asked for an interpleader. No, nor did they ever ask that we predict the future and move the money. So, in fact, one of the arguments that Aldewenda made in response to the second, the October efforts to authorize Vanguard to release the accounts is, no, there's no immediate and irreparable harm because the assets are safe and secure at Vanguard. If they thought there was an issue with the way the funds were invested, they probably would have raised it then. They didn't raise it until the market declined. Do we have to affirm the district court rely on the economic loss doctrine, or can we simply rely on the contract line? I don't think that this court needs to wade into the depths of the economic loss doctrine. I think it's contractual justification. And as I said, if the economic loss doctrine means anything, it means that a duty in tort cannot supersede a contractual right. And as we argue in our briefs, even if there were no contracts, I don't think they've established conversion or negligence. And on the conversion point under the, I always have trouble pronouncing it, the Jocolomus case, if there is a dispute over ownership, it's not conversion to make a qualified refusal to turn the property over until it's been resolved. This was being actively litigated. And on the negligence claim, there clearly is no duty to predict the future. The Supreme Court of the United States said that in the Dudenhofer case. And that was a fiduciary duty case on a motion to dismiss. Well, but the negligence was not turning over the money to us. I mean, that was one aspect of the negligence. And when we asked for it, you should have given it to us, which is different from the claim of stocks going down. It's contradicted by the contract. And any such duty is a contractual duty. But you're talking about independent now. You're talking about assuming there were no contracts. You were making the argument that there's still no negligence and still no conversion. Right. And I would argue that as a matter of law, I mean, you don't need to reach this issue, but as a matter of law, it is not unreasonable or negligence to refuse to turn over accounts where there's a TRO telling us that we should not and where there's a court that has refused to authorize us to do so. What was the period of time between the first indication that Vanguard received a claim from Mr. Pollack and I guess shortly thereafter the other claim and the time that the TRO was sought by them to have you turn it over? I'm sorry, that the order was issued to turn it over? What period of time occurred? So the TRO was entered in, I think, late July of 2014. And then we immediately received a letter from Aldabuenda's counsel threatening to sue us if we released the money and providing us with a copy of the TRO. Then in October, they went into court for an order. It's titled Authorizing Vanguard to Release the Funds, which was denied. Roughly three months, four months, something like that between those periods. I think that's about right. From the time there was first notice of a dispute, which was in, I think, July, until the money was released in March, whatever that is. My math isn't great. Does the record reflect what losses, if any, had occurred during that time in the account? You said the market. The market loss? Yeah. I honestly am not sure if there is evidence in the record of what that was. They didn't offer any evidence on summary judgment other than an affidavit. So, I mean, I will stipulate that there was some loss, but it was unpredictable. Okay. All right. Unless the Court has any further questions. I think not. Thank you, Your Honor. So the case just argued is submitted, and we will now, with excitement, turn to the second case of Vanguard, which is Pollack v. Vanguard Fiduciary Trust.
judges: M. Smith, Friedland, Amon